Good morning, Your Honors. May it please the Court, my name is John Dittman. I'm an Assistant Attorney General representing Mr. Canady in this matter. We're here today on a question of qualified immunity. The Eighth Amendment is not implicated in a prison setting in voluntary employment. The print shop job that Mr. Morgan was working at is, by statute, a voluntary job. Mr. Morgan applied for the position, submitted a resume, was accepted for the position. He was covered by L&I Workers' Comp while working in that position, and by statute he was Is that true of the involuntary positions as well? The Class III positions? The L&I coverage? No. There is no L&I coverage for the ordinary Class III positions. By statute, Mr. Morgan worked at that job by his own choice. If somebody in that job decides at a given day, I don't feel like working today. Is that inmate free to call in and say, no, I'm not into it today? Actually, there's a provision, and if the Court would look at the excerpt of record at page 62, there's a provision for three unexcused absences for these jobs prior to being terminated from the position. So essentially, in a ---- That's not very different from an ordinary employment. This is ---- It's our position that this is very similar to employment outside of the ---- It doesn't mean that you can come when you feel like it and not come when you feel like it. I mean, you have an obligation to report for work, but you don't get fired if you miss three days. Right. It's ---- He is obligated to come to work, having accepted the position at Crenshaw. And if he doesn't go to work, he can be disciplined. If he fails, according to the rules, if he fails to show up three times unexcused, he may be terminated. And I think it provides that he can't reapply for the position for 180 days. It's our position that this voluntary nature of ---- What happens to someone on one of the other jobs? The class three, the regular, mopping the floors and working in the kitchen? No. I don't know how many excused, unexcused absences they can have. But ultimately, they're going to be subject to infraction for failing to program or failing to work in their job assignment, I would imagine. Let me see if I can understand what the practical impact of your position would be. If you have one of these voluntary jobs in the prison, for example, and it involved some kind of harmful chemical and the supervisor says, well, don't worry about the goggles and don't worry about the gloves. We've got to keep moving today. And everyone knows that these chemicals are highly toxic. And they keep saying, just do your job. There would be no liability for the prison, in your view, because it would be a voluntary job? The Eighth Amendment would not be implicated. There would, if it were a class two job, potentially there's L&I coverage for any harm. But because the inmate can perceive and avoid that particular harm, the Eighth Amendment is not implicated. But, see, the one difficulty is, does it change if you ---- And then you're assigned to that job so that you then have to abide by the rules about showing up and not just refusing to work, for example. Well, it changes only so far as you need to quit and tell someone that I don't want to work at this job anymore. But there's nothing ---- If there's a choice between a job which, in and of itself, is not a hazardous job, but is made hazardous by the malfeasance or lack of exemption of the prison, you're saying the choice is, well, just take the kitchen job and don't take the voluntary job even though, in and of itself, it wouldn't be a dangerous job? Right. If the ---- the gist of the issue, if the inmate has the choice, then the Eighth Amendment is not implicated. And, again, we're not speaking here of negligence and potentially in the class three nonvoluntary positions, the inmate may have a claim for negligence. The only reason Mr. Morgan does not is he's got an L&I coverage and he's barred from serving. He's got what kind of coverage? I'm sorry. Worker's comp, Your Honor. Labor and Industries in the State of Washington. So in what do you think is the best authority for your argument about the distinction between this kind of a voluntary job and a mandatory position? I think the Ossolinsky case is, even though not involving work, the best authority on the subject. And in Ossolinsky involved an inmate that was exposed in a visiting area to essentially a defective oven door that the prison knew about and was injured when the door fell or hit him. But what the Ossolinsky court said, this court said in Ossolinsky, is that to the extent that the inmate can perceive and avoid the hazard, the Eighth Amendment is not implicated. And I think that translates over to the class two positions. I understand this case is a little different because there is a time gap between the plaintiff's determination that it was on their decision that maybe this isn't the best thing to do and his request to leave and his being told that, no, we can't stop to fix it now because we're in a hurry and the injury was some time later. Assume for a moment all this happens on the same day, that an inmate working in prison industries finds a condition which the inmate believes is unsafe, asks to stop work, is told, no, we have to get this job done, we can't stop to fix it now. An ordinary employee at a company would have the option of leaving and would risk employment, but that's all. But he's in a prison. He may have the option and under the correctional industry guideline, apparently doesn't get terminated until after three unexcused absences, but he also has an obligation under prison regulations to work. What would he face if someone suddenly decided this isn't right for me, I'm out of here, and walks off? Separate and apart from termination by prison industries, what's the prison disciplinary risk that he faces? To the extent that he informs his supervisor that he's leaving, there's no provision for any infraction in this voluntary job. You can't just walk off the job without letting someone know where you are. So what I'm trying to focus on is, I see page 62 in the record, the correctional industry's provisions. Is there something else outside? Does he face prison discipline if he's not working? If he is utterly refusing to program, be it working in another job or be it some other job, if he's in this class two job choosing and telling someone he is choosing not to work, he would not face discipline. I guess the other question I have is, it seems like, if I get this right in that Owinski case, he's in this visiting facility. He's just in the facility and this oven door falls off, correct? He's not working there. Correct. So it would be like if he were walking down the cell block and something, you know, fell out of the ceiling, for example. And it turns out you have a defective ceiling because you've got a bunch of water and stuff. So it's just a condition in prison that turns out to cause injury. Well, it's a condition that the inmate has perceived. And in Owinski, the Court made a point to say that he had he could perceive and could avoid if it's a condition in prison that the inmate can perceive, a puddle of water on the floor, for example. Right. But I guess what I'm trying to say is it seemed to me that there might be a distinction between seeing a puddle of water on the floor, seeing a jagged edge on a cell bar or something like that, and working in a place and saying to the person, hey, we've got a problem here, this machine is going wild on us. I mean, do you not see some distinction in those two circumstances? My time is almost up, but if I may answer. We'll get saved by that. Not under the Eighth Amendment. Unless there's any questions. Thank you, Your Honor. Please, the Court. My name is Tim Ford. I represent Steve Morgan. I'd like to start with Judge McKeown's question. I think there is a huge difference, Judge. I think the difference is the Thirteenth Amendment to the Constitution of the United States. This Steve Morgan could not have been required to be at this job for $1.10 an hour subject to a penalty of actual imprisonment, lengthening of his imprisonment if he had an unexcused absence. If you look, Judge Clifton, at our brief at page five, we cite four and five. We cite several Washington Administrative Code provisions that were applicable here. By law, unexcused absence. If Mr. Kennedy did not say, okay, leave, which he did not, he said, keep working. That's what he told Mr. Morgan. That's an order. If Mr. Morgan does not follow that, he does time in the hole, potentially. He does more prison time. He loses good time, potentially. If he has an unexcused absence, he does time in the hole, potentially. He loses good time, potentially. If he refuses to program. All those kind of conditions can only be imposed on him because of his situation as a convicted prisoner. Otherwise, it would be slavery in violation of the Thirteenth Amendment. I have trouble taking as a given that all of those things would have happened, but I can understand the argument that at that time he couldn't be confident otherwise if all of this had happened on the same day. But it didn't happen on the same day. There was actually a period of time between when he was told to keep working and when the injury occurred. And is there anything that prevented him during that duration from seeking to say, okay, this isn't going to work for me. I'll revert to whatever other prisoners do, even though I don't get the dollar an hour that way. Well, he says no. I mean, he was not able to do that. He had gone to Mr. Kennedy more than once. Mr. Kennedy told him to keep working. They were under pressure, our evidence is, to try and get their printing forms and things for the State, and they had high volume. That's why they didn't want to stop. That's our evidence. But remember, they didn't stop that day. But how long was it until he was actually injured? I think that the evidence was it was something like several weeks between then. I don't know that we have an exact date. But remember, Judge Clifton, I think the real question is, is this an issue of law, a condition of confinement? And I think that Judge Lasnik actually should have ruled as a matter of law this was a condition of confinement because he could not – it is a prison industry. It is not a visiting area. It is not something you're casually encountering. It's something you're required to do and can only be required to do because you're a prisoner. Is there any case that draws the distinction that the State is relying on between the voluntary work program and involuntary in the sense of you have to work and one of the jobs is classified as voluntary and one is not? Is there any case that draws a distinction and says the Eighth Amendment applies to one and not to the other? I have not seen one, Judge Reinhart. I have – I think it's this Ossolinsky case, which really is a really quite a different situation. Its visiting area is, as Judge McKeown points out, really just part of the prison. It's quite clearly established that slip and falls are defective conditions and that are – Well, how does that establish a distinction between the two types of work in a prison? I think it does not. I think it's a mistake for that to even go down that road. I mean, if you're on the chain gang, maybe if you're a senior prisoner, you have a choice between swinging the hammer and holding the spike. But when the – if you choose to hold the spike and the head comes off the hammer after you've complained and hits you in the head, they can't say it's your own fault. If you choose to – if you may – you have a right in Washington prisons to ask to be sent to different prisons. If you show up at a prison that you asked for and find out that the conditions are grossly unconstitutional, the guards are beating people up or it's unsafe, are they going to be able to say, oh, you chose, you had a choice? I think that that's really a false distinction in the prison context, and I think this Ossolinsky case is being taken out of context here. I think that if – so I think it should be as a matter of law. If you're doing prison work, it's a condition of confinement, you're being paid prison wages, you're required to do it, you don't have the freedom of a worker, it's in the prison, then the Eighth Amendment applies as a matter of law. But if you go into the factual question, Judge Clifton, I think it's important to remember, because this is prison litigation, and in prison litigation you really, I think, have to rely on inferences that we're, of course, entitled to at the summary judgment stage, reasonable inferences. Our evidence shows that this is a shop that was being run by the defendant here who deliberately took safety switches off this machine because it was shaking and shutting itself down because of the violent shaking that Steve Morgan says resulted in the pulling off of his thumb. The response of this manager was, go back to work, I'm taking the safety switches off so we can continue to have this thing shake and rattle, so we can continue to pump these forms out for the State and not have a slowdown here. So I think that you have to, in considering this gap and this question of why didn't Mr. Morgan do more and would the State have really been so generous and considerate if he had taken more firm action in response to these safety concerns, I think you have to really consider the realities of prison life and the realities of an operation like this that is not really being run, our evidence shows, in the way that the State would have you believe it is being run. The print shop is not being run in a safe manner, but we don't know, at least I haven't seen anything in the record, what would have happened or what did happen if there had been a request made by your client through whatever other prison channels were available. I mean, Mr. Kennedy wasn't running the prison, he was running the print shop, and presumably a request could have been made to change assignment or to explain, I don't feel safe, we don't get along, whatever else, to seek a reassignment during the time period before the injury occurred. And, of course, we'll never know, and we will never probably get, even to the extent that people are always subject to error when they're predicting the future, we're probably never going to get the most candid and reliable responses from either prison officials or prisoners in a contested situation. I have no doubt that prison officials will assure you that he would have been given an instant transfer. And that's why I would urge this Court to say, in this case, that really the district court should not have gone down this road with Ossolinsky, that Ossolinsky applies in a very different context, and that when you're talking about something that is part and parcel of the sentence that is imposed and that could not be imposed on a free person and that is within the physical and legal jurisdiction of the prison, that that is a condition of confinement and that this distinction is done to apply. I want to shift gears slightly. If we were to accept your argument and say that given the employment situation, the question I then have is, what do we do about qualified immunity? Because we're in a situation where everyone here says, well, Ossolinsky, well, you say Ossolinsky is not quite on point. The state says it is for a different reason. But if it's not on point, and you're familiar, of course, with Hoptowitt and what it covers, what is the clearly established law which they would be aware at that time? Well, I think that Hoptowitt does it. I mean, Hoptowitt says the prison industries of the Washington State Prison have to be maintained in a way that is not deliberately indifferent to safety. And there were many safety concerns that are not that much different from this that were in the Hoptowitt record, I believe. But also Ossolinsky. The problem I have is I read Hoptowitt and it says, you know, serious safety hazards, da, da, da, da, da. But then you go to Olinsky, which comes after that, and it says, well, but no, Hoptowitt is more of a broad condition and no case has established a single device situation. So where does that leave us on established law? Well, I think that Ossolinsky also does cite the Gill case, which is a defective ladder and establishes what we believe the clearly established law was in 2000, which is the way we phrased it was known danger plus, that there was a known danger and they did more. And in Gill, just as here, they did more by ordering the person to continue to work after they knew of the defective condition. And actually, I think we have known danger plus plus because we not only have a known danger, but we also have the order to go back to work, and we also have the removal of the safety switches to permit the dangerous condition to continue, despite the request. So I think we are above that threshold. Would the oven be a known danger plus because there had been requests to repair the oven in Olinsky? I think it was a known danger. I don't know about the plus. I don't know that anybody ordered Mr. Olinsky to go over there and have visitation. Right. There was none of that. That was not any part of his condition of confinement. And, again, I think this is always the concern we have in qualified immunity. If the state can take a case, which I think is from a different area, and transplant it into this area and then say it wasn't clearly established that that didn't fit here, then we're never going to have any clearly established law. Everybody in 2000, I think, knew that prison industries are supposed to be maintained safely and that the facts that we've described of a dangerous condition, a complaint, and a refusal, an order to go back, and an actual enhancement of the danger, violated the constitutional rights of these prisoners. I'm out of time. I think I'm out of time. It's going backwards. Thank you. Thank you, Ken. Did you want one minute for rebuttal? If I had an opportunity, my time was up. Yes. We'll give you one minute if you need it. Just to quickly respond as far as the danger plus plus. There is certainly a dispute on the safety switches, but the safety switches are part of this single device. And Osmolensky is applicable to this case because a voluntary exposure, whether it's in a workplace or another setting, does not give rise to an Eighth Amendment violation. And the objective facts in this case show that Mr. Morgan's exposure to this machine is purely voluntary. And the fact that the accident ---- Is there anything that ---- I think you said Osmolensky is your best case. Is there anything that says that you distinguish between the two types of workplace and the prison? In a workplace setting, no, Your Honor. The key word is voluntary and perceive and avoid. And it's the Farmer reasoning, the Osmolensky reasoning, that makes that case applicable to this voluntary workplace setting. Well, there's nothing that says once you have an overall mandatory work program that we're going to treat some of the jobs as not part of that mandatory work program. Because those particular jobs you have a choice about. You don't have any choice about working in a job. You're in a mandatory work program. And that we're going to apply the Eighth Amendment to some of those jobs but not to others. You don't have any case that says anything like that. There's no case that discusses that issue, Your Honor. Again, there's cases that discuss the ability of the inmate to perceive and avoid the harm and the fact that he could move on to a different job. It was in his power by statute to do so. You don't have any case that says you can move to a different job? We have a Washington State statute that says that. One last question. Is there anything on the record as to whether he got his LNI coverage for the loss? He filed a claim, Your Honor, and there's nothing on the record whether he got it. But inmates ordinarily are not entitled to receive benefits until they're released. Thank you. Thank you, counsel. Case just argued will be submitted.
judges: Reinhardt, McKeown, Clifton